UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                               :

UNITED STATES OF AMERICA,          :

                                    :

          -v-                  :               S13 16-CR-387 (JMF)

                                    :

LUIS BLONDET,                   :              <u>OPINION AND ORDER</u>

                                    :

                  Defendant.        :

                                    :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Luis Blondet was a high-ranking member of a violent drug-trafficking organization based

primarily in Puerto Rico.  Between 2004, when the organization was founded, and 2016, members

of the organization brutally murdered dozens of people.  One of those people was Crystal Martinez-

Ramirez, whom Blondet killed on April 9, 2005, after she rebuffed his sexual advances at a party.

For this conduct, Blondet was charged with four crimes: conspiracy to distribute five kilograms or

more of cocaine, racketeering conspiracy, murder in aid of racketeering, and murder through the use

of a firearm.  He pleaded guilty to the first of these charges and went to trial on the other three.  On

April 8, 2022, a jury found Blondet guilty on all three of these charges.

      On April 6, 2022, Luis Blondet moved, pursuant to Rule 29(a) of the Federal Rules of

Criminal Procedure, for judgment of acquittal on the three counts tried to the jury.  *See* ECF No.

693.  On May 9, 2022, after the jury's verdict, Blondet renewed his motion.  *See* ECF No. 749.  By

bottom-line Order entered on September 6, 2022, the Court denied Blondet's motion with respect to

his conviction for racketeering conspiracy, but reserved judgment on his motion with respect to his

convictions for the murder of Martinez-Ramirez.  *See* ECF No. 784.  As to those crimes, Blondet

argues that the evidence was insufficient to prove beyond a reasonable doubt that he committed the

murder "for the purpose of . . . maintaining or increasing" his position in the racketeering enterprise, as required by the relevant statute, 18 U.S.C. § 1959(a).

In one sense, Blondet's motion for judgment of acquittal on the two murder counts is academic: For his other two convictions, Blondet faces a sentence of up to life imprisonment, and there is little doubt that the Court can, even without the two murder counts, consider the killing of Martinez-Ramirez in imposing its sentence because it bears on, among other things, "the history and characteristics of the defendant," "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). At the same time, Blondet's motion implicates the constitutional principle that no person may be convicted of a crime unless the Government has proved his guilt of that crime beyond a reasonable doubt. For the reasons that follow, the Court concludes that that bedrock principle, and the plain language of Section 1959(a), mandate that Blondet's motion be granted. Put simply, as reprehensible as it was, Blondet's murder of Martinez-Ramirez arose from a purely personal dispute and there is no evidence to support the Government's theory that one of Blondet's purposes in committing the crime was to maintain or increase his position in the enterprise.

## RELEVANT FACTS

Blondet was originally indicted, with only one co-defendant, on a single charge of conspiracy to distribute or possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 and 841(b)(1)(A). *See* ECF No. 1. On January 9, 2017, Blondet pleaded guilty to that crime, for which he faces a sentence of between ten years and life in prison. *See* ECF No. 43, at 2, 12-14. Before the Court sentenced Blondet, however, a grand jury returned a Superseding Indictment charging him — and seven new co-defendants, including Julio Marquez-Alejandro — with even more serious crimes. *See* ECF No. 69 ("S1 Indictment"). To the extent relevant here, Count One of the Superseding Indictment charged Blondet with racketeering

conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d); Count Two charged him with murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) & 2; and Count Three charged him with murder through the use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(j)(1) & 2.  Counts Two and Three both related to the alleged April 9, 2005 killing of Crystal Martinez-Ramirez.

**A.  La ONU**

On March 16, 2022, Blondet and Marquez-Alejandro went to trial on the charges in the Superseding Indictment.  At trial, overwhelming evidence established that the two were members and leaders of a violent drug-trafficking organization called *La Organization de Narcotraficantes Unidos*, or La ONU, an alliance of smaller drug-trafficking organizations based in public housing projects in and around San Juan, Puerto Rico, including the neighboring Manuel A. Perez ("MAPA") and San Jose public housing projects.  Marquez-Alejandro was the leader of the MAPA crew and one of La ONU's founders; Blondet, a member of both the MAPA and San Jose crews, was one of Marquez-Alejandro's closest allies and, in 2013, one of his successors.  Between in or about 2004, when La ONU was founded, through in or about 2016, members and associates of La ONU committed dozens of murders, attempted murders, and assaults; distributed thousands of kilograms of cocaine, including shipments from Puerto Rico to the Bronx, New York; and routinely bribed corrupt police officers to assist the enterprise in committing murders, distributing drugs, and providing intelligence about law enforcement and rival organizations.

Evidence about La ONU's formation, rules, purposes, members, and criminal activities came primarily from four former members of the organization who testified pursuant to cooperation agreements with the Government: Harold Figueroa-Sanchez; Reinaldo Cruz-Fernandez, a/k/a "Remy"; Jose Victor Pellot-Cardona, a/k/a "Vitito"; and Jorge Asencio Viera, a/k/a "Macar."  As they explained, Marquez-Alejandro and others formed La ONU to minimize conflict between and

among the drug crews in the different housing projects and to facilitate the purchase and sale of

drugs.  *See* Tr. 256, 280, 898-99, 1179, 1221, 1529.[1]  The leaders of La ONU made decisions about

drug prices, where and by whom drugs could be sold, and to whom they could be sold.  *See* Tr. 256,

280.  More significant for present purposes, the leaders of La ONU also made decisions, in

Figueroa-Sanchez's words, "as to who lived and who died."  Tr. 256; *see also* Tr. 280, 292-93, 606,

1208, 1550.  Indeed, as a "rule," murders had to be "pre-approved" by the leaders of La ONU; in

the case of murders within MAPA, that meant approval by Marquez-Alejandro.  Tr. 607, 936; *see*

*also* Tr. 292-93, 1550.  Another "rule" provided that "women and children were not supposed to be

murdered."  Tr. 607; *see also* Tr. 936.  Violation of these rules usually meant death. As Cruz-

Fernandez explained, for example, if someone committed a murder in MAPA that had not been

authorized by Marquez-Alejandro, "[t]hat person would die too."  Tr. 936.

The evidence at trial made plain that members of La ONU killed with ruthless abandon.

They killed people from rival crews; they killed rivals within La ONU; they killed La ONU

members suspected of cooperating; they killed civilians who had reported criminal activity to the

police; and so on.  Indeed, the four cooperating witnesses who testified at trial, by themselves,

admitted to a collective total of forty-nine murders.  *See* Tr. 2136.  For his part, Blondet was

implicated in at least seven murders: the April 9, 2005 murder of Martinez-Ramirez, *see* Tr. 724-27;

the April 29, 2008 murder of Hommysan Cariño-Bruno, *see* Tr. 346-49, 360-61, 376-84, 919, 1172-

74, 1242-43, 1514; the murder in or about 2016 of Alex DeJesus, *see* Tr. 1287-94; and two double

murders that predated the formation of La ONU (evidence of which was admitted at trial for only

---

[1]      "Tr." refers to the transcript of trial; "GX" refers to a Government Exhibit admitted at trial;
and "DX" refers to a defense exhibit admitted at trial.

limited purposes), *see* Tr. 884-86, 887-91, 1207-10.  Of these murders, however, Blondet was

charged substantively with only one: the murder of Martinez-Ramirez.[2]

## B.  The Murder of Martinez-Ramirez

Martinez-Ramirez's body was found on April 9, 2005, on the sidewalk near the intersection

of Calle Jerusalem and Calle Pena Lara in MAPA, down the block from a barbershop.  *See* Tr. 669-

70.  Crime scene investigators observed and photographed a large amount of blood on the sidewalk

in front of the barbershop, near a .380 caliber shell casing, as well as a trail of blood leading away

from the barbershop and to the corner where Martinez-Ramirez's body was found.  *See* Tr. 676-81;

GX 210-F to -P.  Inside the barbershop, investigators found another .380 caliber shell casing on the

floor, as well as large amounts of blood, dollar bills, beer cans, cups, and bottles of alcohol

throughout the barbershop.  *See* Tr. 670-71, 681-88; GX 210-R to -JJ.  In a "very small" bathroom

near the back of the barbershop, there were a broken sink and a pair of earrings on the floor.  *See* Tr.

689-90, 703-06; GX 210-KK to -LL; DX 14.  An autopsy of Martinez-Ramirez revealed that she

had been shot in the face and in the back of the head.  *See* Tr. 640-43.  The bullet wounds caused

massive bleeding and damage to her central nervous system, leading to death.  *See* Tr. 650.

---

[2]     The Court uses the term "murder" with respect to the homicide of Martinez-Ramirez
advisedly and notwithstanding Blondet's argument in his Rule 29 motion that there was insufficient
evidence at trial for the jury to find that he committed murder (as defined by Puerto Rican law), as
opposed to manslaughter.  *See* ECF No. 695 ("Def.'s Mem.") 13-16.  In the Court's view, the jury
was on more than firm ground rejecting Blondet's argument that the killing — the details of which
are described below — was the result of "a sudden quarrel or in the heat of passion, in response to
sufficient provocation on the part of the victim."  *Pueblo v. Rivera Alicea*, 125 P.R. Dec. 37, 46
(1989) (translated from Spanish).  Among other things, the provocation capable of reducing the
crime of murder to voluntary homicide under Puerto Rican law must "be of such a nature to cause a
reasonable person to lose self-control, causing the person to act in response to sufficient
provocation, without due consideration, and without forming a specific purpose."  *Id.* at 47 (internal
quotation marks omitted).  Blondet's argument — that no reasonable jury could have found that
Martinez-Ramirez's rejection of his sexual advances did not constitute a "provocation," let alone
one that would make a "reasonable person" lose control of himself and kill her — is as offensive as
it is legally groundless.

Hector Velez-Santiago, an associate of La ONU subpoenaed by the Government to testify at trial, provided direct evidence of Blondet's role in Martinez-Ramirez's death. Tr. 718-27. Velez-Santiago testified that he first met Blondet in or about 2003 or 2004, when "Papito," a member of La ONU, introduced them (although he knew Blondet to have been a been a member of La ONU with a drug spot in MAPA before they were introduced). *See* Tr. 718-19, 721-23. On the night of the murder, "Papito" invited Velez-Santiago to a party at the barbershop in MAPA to have some drinks before going out to a disco. *See* Tr. 723. Upon his arrival, Velez-Santiago was standing outside the barbershop making a telephone call when he saw a body "flying out of the barbershop" and "fall[] on the sidewalk." Tr. 724-25. Immediately thereafter, Blondet came out of the barbershop and "shot the body two or three times on the head." Tr. 725-26. Then, Blondet, with the assistance of another person known as "El Fuerte," picked up the body and carried it to the corner. *See* Tr. 726-27. With "Papito," Velez-Santiago left and went to a club. *See* Tr. 798. At the club, "people from MAPA" were discussing the incident. They said "the dancer" had hit Blondet and that the two of them "had had an argument or something inside." Tr. 793-94. According to Velez-Santiago, the "people" said they "did not approve of what [Blondet] had done." Tr. 794.[3]

## C. The Aftermath of the Martinez-Ramirez Murder

Blondet's killing of Martinez-Ramirez proved to be highly controversial; in the days and weeks that followed, leaders of La ONU met several times to discuss how to respond to it, including whether to kill Blondet for violating La ONU's "rules" by killing a woman and killing without La ONU's pre-approval. Three of the Government's cooperating witnesses — Pellot-Cardona, Figueroa-Sanchez, and Asencio-Viera — testified about these meetings. Most significantly, Pellot-Cardona testified about a meeting that he had in MAPA a few days after the murder, with Blondet,

---

[3]     Two or three days after the murder, Velez-Santiago and "Papito" went to Blondet's apartment, where Blondet was offering a .380 caliber gun for sale. *See* Tr. 728-29, 798-99.

Marquez-Alejandro, and Anthony Declet-Rivera, a/k/a "Chio," the leader of the San Jose crew. Tr. 1227. At the meeting, which was held "to discuss what had happened with this woman, why she had been killed," Blondet explained to Marquez-Alejandro that he had called the woman, who had been invited to the party as a dancer, "into the bathroom with him separately." Tr. 1227-28, 1484, 1499. "He started touching her or something, and she took out . . . some sort of a device to protect herself . . . and . . . started hitting him with it." Tr. 1228. Blondet told Marquez-Alejandro that he had been drunk, that "[t]here were people around who saw her hit him," and that "he was not going to let anybody be disrespectful to him in that way" — he described it as "an intolerable disrespect" — so he killed her. Tr. 1228-29; *see also* Tr. 1485, 1488-90.

According to Pellot-Cardona, "everyone" at the meeting, including Marquez-Alejandro, was "upset" about Blondet's conduct. Tr. 1237, 1498-99. "No one was happy with this situation." Tr. 1237. Pellot-Cardona testified that it was his understanding that Blondet could be killed for doing what he had done. Tr. 1238, 1499. But Declet-Rivera spoke up on Blondet's behalf, noting that Blondet had "participated in all of these murders for the housing project and for us" and he could not "allow [Blondet] — [he couldn't] do anything to get [Blondet] in trouble because" it would "cause a war." Tr. 1237-38. (In the Government's view, "these murders" referred to the double murders that Blondet had participated in prior to the formation of La ONU.) In response, Marquez-Alejandro stated that he "did not agree with what had happened, but for the time being that [Blondet] should, you know, chill, keep a low profile, not come down too much." Tr. 1239. Pellot-Cardona testified that the meeting ended without a "final decision" about what to do in response to the killing. "It was only for Blondet to chill, to keep a low profile." Tr. 1239.

During his testimony, Pellot-Cardona also explained that, at the time of the Martinez-Ramirez killing, Blondet "had a big reputation. He was second in command in San Jose. He was one of the biggest hitmen in the community." Tr. 1229. At that point, the Government asked

Pellot-Cardona if "word" of the killing had "spread throughout MAPA," prompting an objection and lengthy sidebar.  Tr. 1229-36.  During the sidebar, the Government argued that Pellot-Cardona should be permitted to testify that Blondet's reputation would have been harmed had he permitted Martinez-Ramirez to disrespect him without consequence, as it would "confirm[] that the way he acted was based on an understanding in the group about how to maintain reputation."  Tr. 1234.  The Court ruled that the Government could not ask Pellot-Cardona about other's views, but, over Blondet's objection, the Court permitted the Government to ask Pellot-Cardona what, in his opinion, "would have happened to Blondet's reputation had he not reacted by killing" Martinez-Ramirez.  Tr. 1237.  Pellot-Cardona responded: "[I]n my opinion, if he didn't do anything, then people could think, you know, I could hit him too.  And he couldn't afford the luxury of having people think that about him because he was a leader and a murderer."  Tr. 1237.

Figueroa-Sanchez was present at another, broader La ONU meeting in MAPA, with Blondet, Marquez-Alejandro, Declet-Rivera, and others, when Martinez-Ramirez's murder was discussed.  *See* Tr. 311-12.  Marquez-Alejandro brought to the group's attention "something that [Blondet] did, something that wasn't right": that "Blondet killed a woman, a stripper, a dancer, because she didn't want to dance for him."  Tr. 311.  Marquez-Alejandro stated that Blondet "was mistreating her, and she said: Leave me alone.  I don't want to dance for you.  And he shot her and killed her."  Tr. 311-12.  Marquez-Alejandro told the group that Blondet's actions were "wrong" and "should have never happened."  Tr. 312.  "But," Marquez-Alejandro continued, "he's a member of the organization.  He's our partner, and we're not going to go against him over a woman who was a prostitute."  Tr. 312.  Blondet then said that the woman "was a whore, . . . that there was no value to her.  That our relationship was much stronger than that."  Tr. 312.  "He said she was disrespectful to me.  She was disrespectful to me, so I killed her."  Tr. 312.

Finally, Asencio-Viera testified about two occasions when he overheard conversations about Blondet's killing of Martinez-Ramirez.  *See* Tr. 1578-82.  First, during a meeting in MAPA with Marquez-Alejandro, Declet-Rivera, and others from various housing projects, "the topic came up that Blondet had killed a woman because she didn't want to have sex with him."  Tr. 1579.  Later, in or about 2009 at a mini-pub near MAPA, Asencio-Viera witnessed Blondet chastise another member of La ONU, Ken White, for "pushing around a woman."  Tr. 1580, 1740.  Yet another member of La ONU, known as "Hincho," then responded to Blondet: "[W]ell, you can't be talking about that because you're much more abusive.  You killed a woman for not being with you."  Tr. 1580.  Blondet then kicked them out of MAPA.  *Id*.  One or two days later, a meeting was held among the various crews to repair the conflict.  *See* Tr. 1581-82.  During the meeting, Hincho apologized to Blondet for having said in public "[t]hat Blondet had killed a woman for not being with him."  Tr. 1582.  Marquez-Alejandro "apologized for Blondet's actions and said we couldn't keep fighting amongst ourselves because we were all part of La ONU."  Tr. 1582.

**D.  Summations and Verdict**

In its principal summation, the Government argued that Blondet was guilty of murdering Martinez-Ramirez in aid of racketeering because one of his "general purposes . . . was to maintain or increase his position in La ONU."  Tr. 2044.  More specifically, the Government contended that

> one of the reasons why Blondet killed Crystal was his desire to maintain his reputation as someone to be respected and feared.  That's what he thought would help him maintain his position in La ONU.
>
> Your common sense tells you that you can't be a respected leader in a violent cartel like La ONU if you are disrespected at a party with no consequences.  The facts make that clear.
>
> Blondet was at a party in MAPA, in his home territory, where he is a leader of an illegal drug business, one that operates on fear and violence.  At this party was at least one member of La ONU, Papito.  . . . And as time would show, what happened at this party would spread like wildfire among members of La ONU.

At this party, Blondet was embarrassed.  He did not get his way with Crystal.  People saw that he did not get his way with Crystal.  And on top of that, she hit him.  In his mind, this was a sign of weakness and disrespect.

In his mind, he could not afford to let people see that he was weak and tolerant of disrespect from anyone; [] he wanted to maintain his position as a feared leader in a violent drug organization.  That's why Blondet killed Crystal and dumped her body on the corner for all of MAPA to see.

. . . [H]e was sending another message, Blondet was not to be disrespected.  And let's be clear.  Blondet did not try and hide why he killed Crystal.  In fact, he wanted to tell members of La ONU, including Chino, why he killed Crystal.

He wanted everyone in La ONU to know that he would not tolerate such disrespect.  . . .

Blondet, as a member of La ONU, could not let that happen.  He had to take action, and he did.  He killed Crystal Marie Martinez-Ramirez.  And he did it to maintain respect, reputation, and fear.

In his mind, he had to do it to maintain his position in La ONU, and he did succeed in maintaining his position as someone to be feared.  In 2013, after Chino was arrested, it was Blondet and the reputation that he had built as someone to be respected and feared who took charge of the lower part of MAPA.

Tr. 2044-46.  In response, Blondet's counsel conceded that Blondet had killed Martinez-Ramirez, but argued that the evidence did not show that he did so in order to maintain or increase his position in La ONU.  Tr. 2127-28.  Counsel noted that the party "wasn't La ONU business" or even a La ONU party; that the killing had violated La ONU's "rules" against killing women and killing absent pre-approval; that Blondet had been drinking and acted in the "spur of the moment"; and that Blondet was "criticized mightily for what he did."  Tr. 2127-30.  Far from the killing improving Blondet's reputation, "[t]he only thing it did was made his reputation worse."  Tr. 2132.

On April 8, 2022, after less than one day of deliberations, the jury found Blondet guilty on all three counts of the Superseding Indictment in which he was charged.  *See* Tr. 2271.

## STANDARD OF REVIEW

Rule 29(a) of the Federal Rules of Criminal Procedure requires the court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

A defendant challenging the sufficiency of the evidence under Rule 29(a), however, "bears a heavy burden, as the standard of review is exceedingly deferential to the jury's verdict." *United States v. Gu*, 8 F.4th 82, 86 (2d Cir. 2021) (cleaned up).  Specifically, a court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Chavez,* 549 F.3d 119, 124 (2d Cir. 2008) (cleaned up), and it must affirm the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) (stating that a court may overturn a jury's verdict only if the evidence supporting the verdict is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" (internal quotation marks omitted)).  A reviewing court must review the evidence "in its totality, not in isolation." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014).

Significantly, the Government "need not negate every theory of innocence" and "may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 63-64 (2d Cir. 2002).  Indeed, "[t]he law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005) (citing cases).  "Where the Government asks the jury to find an element of the crime through inference," however, "the jury may not be permitted to conjecture or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (cleaned up).  Instead, those inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019)

(internal quotation marks omitted).  "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (internal quotation marks omitted).

## DISCUSSION

As noted, Blondet challenges his convictions on Count Two and Count Three.  The former charged Blondet with murdering Martinez-Ramirez in aid of racketeering, in violation of 18 U.S.C. § 1959(a).  The latter charged him with using a firearm during and in relation to a crime of violence, namely the murder in aid of racketeering charged in Count Two, in violation of 18 U.S.C. § 924(j)(1).  Thus, if the evidence was insufficient to support a conviction on Count Two, it follows that the evidence was insufficient to support a conviction on Count Three as well.  As relevant here, to convict Blondet of Count Two (and, therefore, to support a conviction on Count Three), the Government was required to prove beyond a reasonable doubt that Blondet murdered Martinez-Ramirez "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a)(1).  Blondet wisely does not dispute that La ONU was an enterprise engaged in racketeering activity.  Instead, he argues that there was insufficient evidence for the jury to conclude that he murdered Martinez-Ramirez "for the purpose of . . . maintaining or increasing position" in La ONU.  *See* Def.'s Mem. 4-12.  The Court agrees.

The general parameters of Section 1959(a)'s motive requirement are well settled.  In order to establish that a violent crime (here, murder) was committed "for the purpose of . . . maintaining or increasing position in" a RICO enterprise, the Government is required to prove "that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise."  *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) (citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)); *see United States v. Bruno*, 383 F.3d 65, 83 (2d Cir.

2004) ("[Section] 1959 encompasses violent crimes intended to preserve a defendant's position in an enterprise or to enhance his reputation and wealth within that enterprise." (cleaned up)). Maintaining or increasing position "need not have been the defendant's only, or even his primary, concern, if it was committed 'as an integral aspect of membership' in the enterprise." *Thai*, 29 F.3d at 817 (quoting *Concepcion*, 983 F.2d at 381).  Thus, the motive requirement is satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Concepcion*, 983 F.2d at 381.  The Second Circuit has repeatedly affirmed that "the 'maintaining or increasing position' language in § 1959 'should be construed liberally.'" *Bruno*, 383 F.3d at 83 (quoting *United States v. Rahman*, 189 F.3d 88, 127 (2d Cir. 1999)).

Section 1959(a)'s motive requirement, however, is no mere technicality.  As the Second Circuit explained in *Concepcion*, Congress "included" the requirement "as a means of proscribing murder and other violent crimes committed 'as an integral aspect of membership' in such enterprises." 983 F.3d at 381 (quoting S. Rep. No. 98-225, at 304 (1983), *reprinted in* 1984 U.S.S.C.A.N. 3182, 3483)).  That is, for murder to qualify as a *federal* crime, a defendant's "gang-related purpose" must "be more than merely incidental: It must be within his 'general' purpose, or, in the alternative, the violence committed must be in some way 'integral' to the defendant's membership in the gang." *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008).  Put differently, Section 1959(a) "itself contains no indication that Congress intended it to make gang membership a status offense such that mere membership plus proof of a criminal act would be sufficient to prove a . . . violation.  Otherwise, every traffic altercation or act of domestic violence, when committed by a gang member, could be prosecuted under [Section 1959(a)] as well." *Id.* at 968.  In short, "[b]y limiting the statute's scope to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act

was committed 'as an integral aspect' of gang membership, [courts] ensure that the statute is given its full scope, without allowing it to be used to turn every criminal act by a gang member into a federal crime." *Id.* at 969-70 (footnote omitted).

Blondet argues that the evidence at trial was insufficient to satisfy Section 1959(a)'s motive requirement, even liberally construed, because "the series of events that followed Ms. Martinez-Ramirez's rebuff and perceived disrespect toward Mr. Blondet were entirely personal in nature." Def.'s Mem. 9. The Government does not quarrel with the notion that the murder arose from a personal dispute between Blondet and Martinez-Ramirez. Nevertheless, it contends that the evidence was sufficient for the jury to find "that Blondet killed Martinez-Ramirez to maintain his reputation as someone to be respected and feared in La ONU . . . ; and that Blondet believed that he could not be an effective and respected leader in a violent cartel like La ONU if Martinez-Ramirez disrespected him the way she did without consequence." ECF No. 759 ("Gov't Mem."), at 21-22. The Government is correct in arguing that Blondet's conviction would be valid if at least one of his "general purposes" in killing Martinez-Ramirez was to maintain his position in La ONU by safeguarding his reputation as a man to be respected or feared. *See, e.g.*, *Vernace*, 811 F.3d at 616; *United States v. Santiago-Ortiz*, No. 17-CR-0149 (LAK), 2018 WL 4054859, at *4-5 (S.D.N.Y. Aug. 23, 2018), *aff'd*, 797 F. App'x 34, 36-37 (2d Cir. 2019) (summary order). The question here is whether the evidence at trial was sufficient for the jury to make that finding. To answer that question — that is, to determine the metes and bounds of what evidence would be sufficient to support the Government's theory — it is helpful to examine a handful of cases in which the Government made a similar argument.

On one side of the ledger are *Vernace* and *Santiago-Ortiz*, decisions on which the Government relies heavily here. *See* Gov't Mem. 23-26. *Vernace* grew out of "an altercation that began with a spilled drink." 811 F.3d at 612. Specifically, someone at the Shamrock Bar in

Queens, New York, spilled a drink on the girlfriend of a Gambino crime family associate, Frank
Riccardi.  Riccardi "got visibly upset."  *Id.* at 613.  When the owners of the bar attempted to
intervene and introduced themselves as owning the place, "Riccardi retorted, 'No you don't.  I run
this place.'"  *Id.*  Riccardi then left and proceeded to a nearby social club, "a Gambino gambling
operation that members frequented."  *Id.*  There, Riccardi found two members of the Gambino
crime family, Bartolomeo Vernace and Ronald Barlin.  The three then returned to the Shamrock Bar
and killed the two owners.  *See id.*  Many years later, Vernace was charged and convicted of
racketeering, in violation of 18 U.S.C. § 1962.[4]  Like Blondet here, Vernace did not dispute on
appeal that he fired one of the fatal shots.  Nevertheless, he challenged his conviction on the ground
that the murders "were not related to the activities of the Gambino crime family" but "resulted
instead from a mere personal dispute over a spilled drink."  *Id.* at 616 (internal quotation marks
omitted).

     The Second Circuit rejected Vernace's argument, concluding that "the jury could have
reasonably inferred that Riccardi enlisted Vernace and Barlin to kill the two bar owners for
disrespecting him as a Gambino associate and to uphold the reputation of the Gambino crime
family."  *Id.*  "During his interactions at the Shamrock Bar," the court explained, "Riccardi suffered
an affront (real or perceived) to himself and to his authority as a Gambino associate, and, by
extension, to the family.  Vernace, in turn, helped him address the affront."  *Id.*  In other words, the
court concluded, "a reasonable jury could have concluded Vernace went so far as to commit murder

---

[4]    Section 1962 does not require proof that the defendant committed a crime "for the purpose
of . . . maintaining or increasing" his position in a racketeering enterprise, as Section 1959(a) does.
But to prove a violation of Section 1962, the Government in *Vernace* had to prove that the murders
were "related to the enterprise."  811 F.3d at 615 (internal quotation marks omitted).  Thus, courts
— including the Second Circuit in *Santiago-Ortiz* — have looked to *Vernace* in evaluating the
motive element of Section 1959(a).  *See Santiago-Ortiz*, 797 F. App'x at 37 n.1.

in a crowded bar because such a public display related to preserving (and even enhancing) the reputation of the Gambino crime family and its members." *Id.*

Significantly, the court reasoned that the jury could have found that the murders "link[ed] back to the Gambino crime family in another way." *Id.* Specifically:

> The jury could also have reasonably concluded that Vernace participated in the Shamrock Murders to further his *own* reputation, thereby enabling him to more effectively carry out the activities of the Gambino crime family. The jury heard testimony that one of the goals of the Gambino crime family was to make money through illicit means. By building their own reputations, Gambino members gained respect in the street that they could directly leverage in the family's loansharking and extortion activities.

*Id.* (cleaned up). In fact, the Government presented evidence that one of Vernace's associates later used Vernace's involvement in the Shamrock Murders to collect loansharking debts, telling a victim "that Vernace was 'the real thing' and . . . warning that those sorts of homicides 'happen every day.'" *Id.* "The jury," the court concluded, "could have reasonably concluded that Vernace found it valuable to participate in the Shamrock Murders because doing so would later help him carry out other activities that benefitted the Gambino crime family." *Id.* In fact, the court noted, Vernace "was not punished for participating in the Shamrock Murders — he was, indeed, ultimately entrusted with ruling authority." *Id.* at 618.

In *Santiago-Ortiz*, the defendant, Jose Santiago-Ortiz, and his brother were members of "a violent drug-trafficking organization that sold heroin stamped 'Flow' in the Bronx." 797 F. App'x at 36. In March 2010, the defendant's brother, Jonathan Santiago, got into an altercation with Jerry Tide that left Jonathan with a laceration to his face. *See* 2018 WL 4054859, at *2. Eight months later, the two brothers saw Tide; they then retrieved a firearm and returned "with their drug supplier, Ramon Cruz," to confront him. *Id.* Jonathan "asked Tide if he 'remember[ed] what [he] did to [Santiago's] face,' and ordered Santiago-Ortiz to 'handle him.' Santiago-Ortiz then shot and killed Tide." 797 F. App'x at 36. Evidence at trial established that "Tide's murder was a critical

16

turning point for the Flow heroin organization.  Prior to Tide's murder, Santiago-Ortiz and his brother competed with rival drug dealers for control of the Flow heroin market. . . .  After the murder, Cruz 'consolidated the operation,' and made Santiago-Ortiz his sole distributor of Flow heroin in the area, vastly increasing the organization's profits."  797 F. App'x at 37.  In fact, "[m]ultiple members of the conspiracy attributed" the organization's "success to the respect Santiago-Ortiz commanded on the street" following the murder.  *Id.*

Faced with these facts, Judge Kaplan rejected Santiago-Ortiz's Rule 29 argument that "the killing was motivated only by personal considerations arising out of the March 2010 fight between Jonathan and Tide and was entirely unrelated to the conspiracy."  2018 WL 4054859, at *2.  In reaching that conclusion, Judge Kaplan emphasized the "overwhelming parallels" between Santiago-Ortiz's case and *Vernace*: In both cases, he observed, "a member of a criminal enterprise felt disrespected as a result of a personal dispute . . . ; the defendant and other members of the enterprise gathered in territory controlled by the enterprise, armed themselves, and prepared to take action; and the defendant then returned . . . with the other crew members to avenge that disrespect *and*, in doing so, preserve and strengthen his own reputation and that of the enterprise."  *Id.* at *5 (cleaned up) (emphasis in original).  On appeal, the Second Circuit affirmed.  Given that Santiago-Ortiz made Cruz "a participant in and witness to the murder," and the impact of the murder on the power of Santiago-Ortiz and his organization, "a rational juror could have concluded that Santiago-Ortiz murdered Tide, at least in part, to earn Cruz's respect and establish his authority within the neighborhood, furthering the goals of the Flow heroin conspiracy."  797 F. App'x at 37.

These and other cases point to the kinds of evidence that can support a reasonable inference that a defendant's general purpose in committing a crime of violence was to maintain or increase his

position in an enterprise even where, as here, the crime arises in the first instance from a personal

grievance or perceived disrespect.  They include the following:

- that the victim is or was a rival or otherwise threatened the enterprise (from within or without) or the defendant's position within the enterprise, *see, e.g.*,  *United States v. Laurent*, 33 F.4th 63, 77 (2d Cir. 2022) (victim was believed by the defendant to be a member of his rival gang); *United States v. White*, 7 F.4th 90, 102 (2d Cir. 2021) (victim was a member of the defendant's rival gang and the defendant had "openly discussed his desire to retaliate against members of" the rival gang); *United States v. Diaz*, 176 F.3d 52, 95-96 (2d Cir. 1999) (victim's "actions posed a threat to the [gang's] drug block"); *see also United States v. Hunter*, No. 05-CR-188 (JG), 2008 WL 268065, at *8 (E.D.N.Y. Jan. 31, 2008) (victim "was suspected of having cooperated with the police in a prior criminal case");

- that the crime was premeditated or otherwise deliberate, *see, e.g.*, *Santiago-Ortiz*, 797 F. App'x at 37 ("On the day the shooting occurred, Santiago-Ortiz and his brother encountered Tide, left to arm themselves, and returned with Cruz, who then became a participant in and witness to the murder."); *Vernace*, 811 F.3d at 613 (noting that Riccardi left the Shamrock Bar and then returned after recruiting Vernace and Barlin); *Diaz*, 176 F.3d at 95-96 (defendant authorized murder by a gang member and associate);

- that the crime was consistent with, or likely to advance, the enterprise's goals and interests, *see, e.g.*, *Diaz*, 176 F.3d at 95-96 (victim was a threat to the gang's drug business); *Vernace*, 811 F.3d at 616 (noting that the murders enabled the perpetrators "to demonstrate . . . that the Gambino crime family 'r[an] th[e] place'"); *see also Santiago-Ortiz*, 2018 WL 4054859, at *3 (citing evidence of how the murder enabled the Flow heroin organization to consolidate control of the drug spot);

- that the crime was consistent with, or at least not contrary to, the organization's rules or expectations, *see, e.g.*, *Laurent*, 33 F.4th at 77 (citing evidence that members of the defendant's gang "considered it their duty to commit violence, including murder, against rival gang members" and that "members increased their standing in the Gang through acts of violence"); *Diaz*, 176 F.3d at 95-96 (citing evidence that "it was expected" of the defendant "as one of the highest ranking Latin King leaders to protect the block's drug business"); *White*, 7 F.4th at 102 (noting that the defendant committed the crime with "another [gang] member — consistent with [gang] practices"); *see also United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) (observing that the crime was "in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all, of reacting violently to them and of thereby furthering the reputation for violence essential to maintenance of the enterprise's place in the drug-trafficking business" and noting evidence "that participation in this sort of group retaliatory action in behalf of fellow enterprise members was critical to the maintenance of one's position in the enterprise");

- that the perpetrator enlisted other members of organization, strangers to the personal dispute itself, to commit the crime, *see, e.g.*, *Vernace*, 811 F.3d at 616-17 (noting that Riccardi "enlisted Vernace and Barlin," for whom "the spilled drink was not entirely personal: They were uninvolved; they were not there"); *White*, 7 F.4th at 102 (noting that the defendant

committed the crime with "another [gang] member — consistent with [gang] practices"); *Diaz*, 176 F.3d at 95-96 (a leader of Latin Kings authorized a Latin Kings member and associate to commit murder); *see also United States v. Kamahele*, 748 F.3d 984, 1009 (10th Cir. 2014) (holding that the jury could have inferred the requisite motive based in part on the fact that the principal perpetrator "retaliated by recruiting two other [gang] members"); *Tipton*, 90 F.3d at 869, 891 (two gang members aided a third in killing a man who was been "'messing' with his girlfriend"); *Banks*, 514 F.3d at 971 (the defendant had previously "enlisted his 'little homies' in the gang to beat up and shoot at" the victim); *Santiago-Ortiz*, 2018 WL 4054859, at *5 ("Defendant here carried out the shooting at the urging of his brother, then the leading manager of their narcotics distribution business, and with the assistance of his drug distributor, Ramon Cruz.");

- that the crime was committed at a location or an event either associated with, or sponsored by, the organization or associated with a rival gang, *see, e.g.*, *Laurent*, 33 F.4th at 83 (the fight that resulted in the victim's death "was shown to be a [gang] cause.  It occurred at a party at which many partiers were [gang] members and a [gang] induction ceremony was conducted"); *White*, 7 F.4th at 94-95, 102 (killing occurred on the rival gang's territory);

- that, in committing the crime, the perpetrators signaled, through dress or the like, that they were acting on behalf of the enterprise, *see, e.g.*, *Kamahele*, 748 F.3d at 1009 (holding that the jury could have inferred the requisite motive based in part on the fact that, "when the three men fired, two of them donned blue bandanas, the signature clothing of [the gang]");

- that members of the enterprise had a history or practice of retaliating on behalf of members in similar situations, *see, e.g.*, *Laurent*, 33 F.4th at 84 (citing evidence that members of the defendant's gang had "a duty to treat the rival of one as the rival of all"); *see also Tipton*, 90 F.3d at 891 (citing "the enterprise's policy of treating affronts to any of its members as affronts to all"); *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997) (citing evidence that members were expected to retaliate violently when "dissed" by other gang members), *vacated in part by United States v. Brown*, 123 F.3d 213 (5th Cir. 1997) (stating that the panel opinion as to all but one defendant's conviction remained intact); *Banks*, 514 F.3d at 971 (citing multiple witnesses who had testified that members of the enterprise would be expected to retaliate violently if insulted and would lose standing if they did not);

- that the defendant (or others on his behalf) later used or cited the crime to bolster his reputation or facilitate other crimes, *see, e.g.*, *Laurent*, 33 F.4th at 77 (defendant "bragged to a [fellow gang] member about the killing"); *Vernace*, 811 F.3d at 616 (citing "a secretly recorded conversation where one of Vernace's associates used the Shamrock Murders to collect loansharking debts by telling the victim that Vernace was 'the real thing' and after warning that those sorts of homicides 'happen[ ] every day'"); *see also Santiago-Ortiz*, 2018 WL 4054859, at *3 (noting that Cruz, the defendant's drug supplier, told his supplier "that 'people were scared of' and 'respected' defendant after the shooting"); and

- that the defendant's (or the organization's) power or influence increased following the crime or the defendant was otherwise rewarded for the crime, *see, e.g.*, *Santiago-Ortiz*, 797 F. App'x at 37 ("Tide's murder was a critical turning point for the Flow heroin organization. . . . After the murder, Cruz 'consolidated the operation,' and made Santiago-Ortiz his sole distributor of Flow heroin in the area, vastly increasing the organization's profits." (citation

omitted)); *Santiago-Ortiz*, 2018 WL 4054859, at *5 (noting that the "defendant's stature in the Flow Heroin Organization increased dramatically following the murder"); *Vernace*, 811 F.3d at 618 ("Vernace was not punished for participating in the Shamrock Murders — he was, indeed, ultimately entrusted with ruling authority." (emphasis omitted)).[5]

That is not to say that all, or even most, of this evidence needs be present to support a reasonable inference that a defendant's general purpose in committing a violent crime arising from a personal dispute or grievance was to maintain or increase his position in an enterprise; no doubt, only some of this evidence would suffice. Moreover, this list is not necessarily exhaustive; no doubt, other evidence could help support a reasonable inference. But in the absence of evidence like that set forth above, such an inference is certainly less likely to be reasonable and survive scrutiny.

*Bruno* and *United States v. Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), two cases on the other side of the ledger, are representative. *Bruno* arose from the November 24, 1994 murder of Sabatino Lombardi and attempted murder of Michael D'Urso, two Genovese crime family associates, while they were playing cards at a Genovese crime family social club. Carmine Polito, a Genovese crime family associate, and Mario Fortunato, Polito's friend (who also had ties, albeit looser, to the Genovese crime family), were charged and convicted by a jury of, among other things, violent crimes in aid of racketeering. At trial, the evidence showed that the two planned the shootings for several reasons: Polito owed the two victims significant amounts of money from loansharking; Polito believed that one of the two victims had "set him up" for a robbery; Polito wanted to switch from one Genovese crime family crew to a more "active" crew; and one of the victims had a history of assaulting Fortunato. *See* 383 F.3d at 72-75, 84. On appeal, the Second

---

[5]      The question of whether a defendant committed a violent crime for the purpose of maintaining or increasing his position in an enterprise turns on his purpose *at the time of the crime*. Whether the defendant actually did maintain or increase his position as a result of the crime — that is, what happened *after* the crime — does not speak directly to that question. Nevertheless, the *Santiago-Ortiz* and *Vernace* courts did look to the later effects of the crime, presumably on the theory that, if the crime actually benefited the defendant, a jury could reasonably infer that the defendant expected that result and committed the crime to bring it about.

Circuit reversed on the ground that there was insufficient evidence of Section 1959(a)'s motive requirement.  Indeed, the court concluded that it was "entirely reasonable to conclude that Polito planned the Shootings to avoid repaying his loansharking debts and because he despised D'Urso — in other words, that for Polito the murder of Lombardi and the attempted murder of D'Urso were simply personal matters."  *Id.* at 85; *see also id.* ("The evidence concerning Fortunato's role in the Shootings was even weaker than the evidence against Polito. . . .  Indeed, the only evidence concerning Fortunato's motivation for participating in the Shootings is that he hated D'Urso, who had a history of beating him up.").

In support of that result, the Circuit explained that there was no evidence that shooting Lombari and D'Urso would have enabled Polito to switch crews and, in any event, that it was "simply too tenuous to conclude that switching from a temporarily less active crew to a more active crew within the same organized crime family was likely to result in Polito maintaining or advancing his position in that enterprise."  *Id.* at 84.  More relevant for present purposes, the court observed that "none of the shooters was a made member of the Genovese Family; nor were the Shootings themselves sanctioned by the family."  *Id.* at 85.  Indeed, "there was significant evidence that Polito's shooting of Lombardi and D'Urso was done in contravention of Genovese Family protocols and that Polito's role in the Shootings actually *decreased* his standing in the Genovese Family."  *Id.* For instance, "[i]nstead of taking credit for the Shootings as a badge of honor, the participants laid low and denied any involvement in the Shootings."  *Id.*  And "tape-recorded conversations . . . that were made years after the Shootings showed that higher-ups in the Genovese Family considered killing Polito for organizing the Shootings without proper authorization, but then decided against doing so out of fear that Polito would start cooperating with the Government if he found out . . . ." *Id.*  On that record, the court held, "no rational juror could have found that Polito [or Fortunato] participated in the Shootings to maintain or increase his position in the Genovese Family."  *Id.*

Finally, in *Jones*, upon which Blondet relies, *see* Def.'s Mem. 7-9, the defendant, Luke Jones, was the leader of two drug conspiracies based in "P.T. Barnum," a public housing project in Bridgeport, Connecticut.  *See* 291 F. Supp. 2d at 82.  At trial, several cooperating witnesses testified that "obtaining and maintaining 'respect' were essential elements for any drug organization that operated in the competitive marketplace at P.T. Barnum." *Id.* at 82-83.  "To gain and maintain respect, Jones and the members of the Enterprise as well as rival gangs cultivated a reputation for violence." *Id.* at 83.  More specifically, the Government "presented ample evidence that Jones and members of his Enterprise committed conspicuous acts of violence to maintain respect and protect their drug-trafficking turf." *Id.*  The charged murder itself, however, arose from a more personal grievance: The victim, Monteneal Lawrence, had made an unwelcome romantic overture to Jones's girlfriend when he was in P.T. Barnum attending a party.  *See id.* at 84.  Upon hearing the news, Jones, who was known to be a jealous boyfriend, picked up his girlfriend's brother and a friend — who was "was not actively employed as a drug seller for Jones's organization" and did not know where they were going or why — and went to confront Lawrence. *Id.* at 84 fn.5.  "When Jones entered the party, he asked those assembled, 'Who disrespected my girl?'" *Id.* at 85.  Jones then demanded that Lawrence, who was visibly intoxicated, stand and go outside with him.  Lawrence resisted, and Jones then shot and killed him.  Notably, Lawrence had been from another city "and was neither a drug seller nor a drug user"; nor was there any evidence "that Lawrence knew Jones or was aware that he was a member and leader of the drug-trafficking Enterprise." *Id.* at 84.

Jones was tried and convicted by a jury for murdering Lawrence in aid of racketeering, but the district court found that the evidence was insufficient to support the motive element of the crime.  In particular, the court found that there was no evidence to support the Government's argument that "the jury could infer that Jones perceived all acts of disrespect toward him, whether personal or Enterprise-related, through the prism of his position and membership in the Enterprise."

*Id.* at 92.  Lawrence, the court reasoned, "was not affiliated with a drug-trafficking organization and did not pose a threat to Jones's drug-trafficking activities or the Enterprise's drug turf."  *Id.* at 87. In fact, he "was not from Bridgeport and had no involvement whatsoever in narcotics trafficking"; he and Jones were, until the murder, strangers to one another.  *Id.* at 87.  Additionally, the court explained that "the factual circumstances surrounding the Lawrence murder [bore] no tangible connection to Jones's leadership of the Enterprise or its drug-trafficking activities.  To the contrary, the murder resulted from a purely personal dispute between Lawrence and [Jones's girlfriend] that arose when she spurned Lawrence's romantic advances."  *Id.*

The court rejected the Government's theory that "Jones was required by his position and membership in the Enterprise to react to Lawrence's disrespect" — in propositioning his girlfriend and resisting his commands to get up at the party — "with violence."  *Id.* at 88.  "The record," the court noted, was "replete with evidence that Jones and his associates committed violent acts against individuals who threatened the Enterprise's drug operations . . . .  The same record, however, [was] bereft of any incident, other than the Lawrence murder, where Jones or Enterprise members violently retaliated for a personal act of disrespect committed by an individual who did not pose a threat to the Enterprise's drug-related activities."  *Id.*  More broadly, there was "no evidence to support the government's strained inference that Jones had a generalized need to use violence in response to all acts of disrespect — regardless of whether the disrespect was directed at him personally or was related to the affairs of the Enterprise — in order to maintain his position in the Enterprise or to further the Enterprise's objectives."  *Id.*  "Without such evidence," the court concluded, "it [was] impermissible to infer that Jones's violent response to Lawrence's acts of disrespect was related to the Enterprise's affairs or was an integral aspect of Jones's membership in the Enterprise."  *Id.*  Indeed, to hold otherwise would "blur[] *Concepcion*'s distinction between violent crimes that are committed in connection with a criminal enterprise's affairs and those that

arise from purely non-enterprise-related matters.  Indeed, taking the government's theory to its

logical conclusion, any act of violence committed by a member of a drug-trafficking group, whether

related to its drug-trafficking objectives or not, would be a [Section 1959(a)] offense."  *Id.* at 89.[6]

So, on which side of the line does Blondet's case fall?  The question is a close one, if only

because the Rule 29 standard for overturning a jury's verdict is so hard to meet, but the Court

concludes that it falls on the *Bruno* and *Jones* side of the line and that the evidence is insufficient to

sustain the jury's verdict on Counts Two and Three.  Indeed, the case bears none of the hallmarks of

the cases in which courts have upheld convictions despite the presence of a personal motive for the

crime listed above.  First, like the victim in *Jones*, Martinez-Ramirez was not affiliated with La

ONU or one its rivals, and she posed no threat to La ONU's or Blondet's criminal activities.  *See*

*Thai*, 29 F.3d at 818 (reversing a Section 1959(a) conviction where, among other things, there was

"no evidence, for example, that the bombing was to be a response to any threat to the BTK

organization or to Thai's position as BTK's leader").  Indeed, Martinez-Ramirez was conspicuously

different from *every* other one of La ONU's victims mentioned during trial (of which there were

many): She was not an informant, a member of a rival drug-trafficking organization, a disaffected

member of La ONU, or a threat to the established leaders of the enterprise, and she was not a man.

Second, as in *Bruno* and *Jones*, "the factual circumstances surrounding the . . . murder

[bore] no tangible connection to" Blondet's role in the enterprise or to its criminal activities.  *Jones*,

291 F. Supp. 2d at 87.  The party at which the killing occurred was not a La ONU affair; there was

no evidence connecting the venue to La ONU (other than the fact that it was within MAPA);

---

[6]      In urging the Court not to "place undue importance on *Jones*," the Government asserts that
the decision is "inconsistent with" the Second Circuit's later decisions in *Vernace* and *Santiago-*
*Ortiz*.  Gov't Mem. 25.  The Court disagrees.  Some arguably loose language aside, *Jones* is easy to
reconcile with the Second Circuit's decisions; the different outcomes are attributable to different
facts, not to different legal analyses.  And while *Jones* is obviously "'not controlling here,'" Gov't
Mem. 25 (quoting *Santiago-Ortiz*, 2018 WL 4054859, at *5-6, n.47), it is a helpful data point.

Blondet committed the murder alone and did not enlist other La ONU members; the killing was not planned or deliberate, but a spontaneous reaction (after Blondet had consumed many drinks) to Martinez-Ramirez's rejection; and Blondet did nothing to signal that, in committing the crime, he was acting as a La ONU member.  That is, all signs indicate that the murder "resulted from a purely personal dispute" between Blondet and Martinez-Ramirez, *Jones*, 291 F. Supp. 2d at 87, and that the killing was "simply [a] personal matter[]," *Bruno*, 383 F.3d at 85; *see also, e.g.*, *Hunter*, 2008 WL 268065, at *8 (rejecting the Government's argument that the Section 1959(a) motive requirement was satisfied by evidence that the victim's "disrespect for [the enterprise leader] (by sleeping with his girlfriend) damaged the reputation of the enterprise, thus leading [the perpetrators of the murder] to defend the enterprise against the 'threat' posed by this affair" (citing *Jones*, 291 F. Supp. 2d at 89 & n. 8)); *United States v. Barbeito*, No. 2:09-CR-00222, 2010 WL 2243878, at *19 (S.D.W. Va. June 3, 2010) ("[C]ourts have rejected unsupported inferences, proffered by the Government, that acts of violence by a member of a racketeering enterprise committed for ostensibly personal reasons were motivated by a desire to increase the member's position.").

Third, unlike the murders in *Vernace* and *Santiago-Ortiz*, the killing of Martinez-Ramirez did not advance the goals and interests of La ONU.  To the contrary, the killing was *antithetical* to La ONU's goals and interests, as it — in the Government's own words — "risked unnecessary law enforcement attention and signaled a certain degree of unreliability" on the part of Blondet.  ECF No. 590, at 23.  Relatedly, the evidence was undisputed that the murder violated several of La ONU's "rules" of conduct, which mandated pre-approval of all murders by the enterprise's leadership and prohibited the killing of women.  *See* Tr. 256, 280, 292-93, 606-07, 936, 1208, 1550. Given that evidence, it would be unreasonable to infer that Blondet believed the killing was "expected of him by reason of his membership in the enterprise."  *Concepcion*, 983 F.2d at 381.  If

anything, he had to know that he was expected by reason of his membership in La ONU *not* engage in such conduct and that if he violated that expectation it would jeopardize his standing in La ONU.

Fourth, and consistent with the fact that the killing violated La ONU's rules, there is no evidence, as there was in *Vernace* and *Santiago-Ortiz*, that the killing benefited Blondet after the fact. Once again, quite the opposite. The evidence made plain that the murder caused serious consternation within La ONU. It led to multiple La ONU meetings and was uniformly condemned by leaders and members alike. Blondet was instructed to "to chill, to keep a low profile." Tr. 1239; *see Bruno*, 383 F.3d at (noting that, "[i]nstead of taking credit for the Shootings as a badge of honor, the participants *laid low*" (emphasis added)). Moreover, as with the defendant in *Bruno*, the infraction nearly cost Blondet his life. *See Bruno*, 383 F.3d at 85 (emphasizing that "higher-ups in the Genovese Family considered killing Polito for organizing the Shootings without proper authorization"). In fact, Ascencio-Viera testified that, even several years later, the incident was still dogging Blondet, prompting derision from others and compelling Marquez-Alejandro to apologize for Blondet's continuing sensitivity regarding the subject. Tr. 1580-82. That is, the murder did not, in fact, improve Blondet's position in La ONU; it was an albatross around his neck for years, engendering disrespect and ill will from others who, if anything, exploited it to *diminish* Blondet's authority and stature.[7]

---

[7]     In its summation, the Government observed that Blondet "did succeed in maintaining his position as someone to be feared. In 2013, after [Marquez-Alejandro] was arrested, it was Blondet and the reputation that he had built as someone to be respected and feared who took charge of the lower part of MAPA." Tr. 2046. That is true enough, but, in contrast to *Vernace* and *Santiago-Ortiz*, there absolutely no evidence suggesting, let alone showing, that the Martinez-Ramirez murder played any role whatsoever in helping Blondet to secure the position; to the contrary, as discussed, the incident nearly cost him his life. Thus, it would be pure speculation to infer from Blondet's ascension *eight years later* that he killed Martinez-Ramirez to maintain or improve his position in La ONU. The Government implicitly concedes the point by not arguing otherwise here.

Relatedly, there is no evidence — as there was in *Santiago-Ortiz*, *Vernace*, and even *Jones* — that Blondet (or anyone on his behalf) invoked the Martinez-Ramirez murder to bolster his reputation or facilitate the commission of other crimes.  *See, e.g.*, *Vernace*, 811 F.3d at 616; *Santiago-Ortiz*, 2018 WL 4054859, at *3; *Jones*, 291 F. Supp. 2d at 90-91 (noting that the jury could "permissibly infer that Jones used the murder of Lawrence as a way of intimidating" a competing gang).  At trial, the Government contended that "Blondet did not try and hide why he killed Crystal.  In fact, he wanted to tell members of La ONU, including [Marquez-Alejandro], why he killed Crystal."  Tr. 2045.  But the evidence does not support that contention — or at least the inference that the Government suggested could be drawn from it, that Blondet boasted about the killing.  (That may be why the Government does not repeat it here.)  Yes, Blondet told members of La ONU, including Marquez-Alejandro, why he had killed Martinez-Ramirez.  But there is no evidence that he boasted about it or otherwise used it to burnish his reputation as a person to be respected or feared.  Instead, he did so defensively, to justify the murder and save his own life for his violation of La ONU's rules.[8]  (In any event, even if there was evidence that Blondet had bragged about his murder after the fact, such "*post hoc* comments . . . , by themselves," would arguably be "insufficient to support a finding that [he] was acting with the requisite Enterprise-related motive when he murdered [Martinez-Ramirez]."  *Jones*, 291 F. Supp. 2d at 90-91.)

To be sure, there was ample evidence at trial — most notably, Blondet's own statements — from which the jury could infer that Blondet committed the murder because he felt disrespected by Martinez-Ramirez.  But there is no evidence to support the leap of logic that Blondet felt

---

[8]      Nor, as the Government suggested at trial, *see* Tr. 2045 — though conspicuously, again, not here — does the fact that news of the incident spread widely and quickly support an inference that Blondet acted for the purpose of maintaining his position in La ONU.  It is hardly surprising that news of the murder would spread given that it was a brutal crime and an egregious violation of La ONU's rules that would normally be met with death.  Indeed, it is pure speculation to assume that, absent the murder itself, news of Martinez-Ramirez's "disrespect" would have spread.

disrespected *as a member of La ONU* or that he feared that leaving the disrespect unaddressed would affect his standing or position *in La ONU*.  Although Blondet stated that Martinez-Ramirez had disrespected him, he never stated that the disrespect related to his position in La ONU or would affect his position in La ONU.  Moreover, there is no evidence that any member of La ONU even witnessed Martinez-Ramirez's rejection of Blondet.  The evidence at trial indicated that only one other La ONU member ("Papito") was even present at the party, and there was no evidence that he was inside at the time or witnessed what led to the murder.  In fact, one (perhaps self-serving) comment by Blondet aside, there is no evidence that *anyone* actually witnessed Martinez-Ramirez reject Blondet's advance.  To the contrary, the evidence was that the two were alone in a "very small" bathroom at the rear of the barbershop.  Tr. 689-90, 1228, 1484; *see* GX 210-KK and -LL, DX 14.  Put simply, it takes a leap of logic, if not faith, to infer that, but for Blondet's reaction to the slight, anyone would even have learned about the incident at all.[9]

Additionally, as in *Jones*, there was no evidence at trial "to support the government's strained inference that [Blondet] had a generalized need to use violence in response to all acts of disrespect — regardless of whether the disrespect was directed at him personally or was related to the affairs of the Enterprise — in order to maintain his position in the Enterprise or to further the

---

[9]     Notably, on that score, the record at trial was very different from what the Government proffered it would be in pretrial litigation.  The Government represented repeatedly — including in testimony before the grand jury — that "Martinez-Ramirez disrespected Blondet *in front of the other La ONU leaders*."  ECF No. 276, at 5 (emphasis added); *see also* ECF No. 590, at 6 ("[Martinez-Ramirez] rebuffed his advances and hit him with a whip *in front of other MAPA leaders*, which Blondet took to be an act of disrespect.  In order to maintain his position of respect in the La ONU enterprise given the disrespect she had shown him *in front of other La ONU members*, Blondet then started beating her, threw her out of the door into the street, and shot her to death.  *Another La ONY* [sic] *member helped Blondet carry the body away* from the barbershop and dump it on the sidewalk around the corner." (emphases added)); GX 3512-37 (grand jury testimony that Velez-Santiago had described the party as one "attended by some of the upper level organizational members of La ONU" and that he had heard "Martinez-Ramirez had disrespected Luis Blondet in the presence of other organizational leaders").  As noted, there is no evidence that anyone from La ONU witnessed anything that occurred inside the barbershop.

Enterprise's objectives."  291 F. Supp. 2d at 88; *cf. Laurent*, 33 F.4th at 84 (affirming a conviction based in part on evidence that members of the defendant's gang had "a duty to treat the rival of one as the rival of all"); *Tipton*, 90 F.3d at 891 (affirming a conviction based in part on "the enterprise's policy of treating affronts to any of its members as affronts to all").  Indeed, here too, the record was "replete with evidence" that Blondet and his associates "committed violent acts against individuals who threatened the Enterprise's drug operations," such as perceived rivals, members of other trafficking organizations, informants, and the like.  *Jones*, 291 F. Supp. 2d at 88.  Yet the same record was "bereft of any incident, other than the [Martinez-Ramirez] murder, where [Blondet] or Enterprise members violently retaliated for a personal act of disrespect committed by an individual who did not pose a threat to the Enterprise's drug-related activities."  *Id.*  In fact, the record did contain one other incident in which Blondet was publicly "disrespected" by someone, one that had a much closer nexus to La ONU: the "Hincho" and Ken White incident described by Acencio-Viera.  *See* Tr. 1580-82.  Yet, Blondet did *not* respond to that affront with violence.

Ultimately, the only evidence that comes close to supporting the inference urged by the Government is the testimony of Pellot-Cardona that, in his "opinion," if Blondet "didn't do anything" in response to Martinez-Ramirez's rejection, "then people could think, you know, I could hit him too.  And he couldn't afford the luxury of having people think that about him because he was a leader and a murderer."  Tr. 1237.  Blondet argues that this testimony was inadmissible, *see* Def.'s Reply 5, but the Court need not — and, in fact, may not — consider that argument here.  *See Bruno*, 383 F.3d at 82 ("In situations where some Government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence." (cleaned up)).  But even if the testimony was properly admitted, it does not get the Government across the sufficiency line for two reasons.  First, Pellot-Cardona's testimony was evidence of *his* state of mind (long after the fact, no less); it is pure speculation to

29

impute his views to Blondet, let alone to Blondet at the moment of the murder — which is what matters.  Second, Pellot-Cardona's opinion was premised on assumptions that had little or no support in the evidence at trial: that other people witnessed Martinez-Ramirez's conduct toward Blondet and, relatedly, that, but for the murder itself, news of that conduct would have spread.  As noted above, however, there is no evidence (aside from Blondet's own, perhaps self-serving comment) that anyone, let alone anyone connected to La ONU, witnessed what happened between Blondet and Martinez-Ramirez in the bathroom that prompted his violent reaction, and it is pure speculation to say that anyone would have learned of the incident but for the murder itself.

In the final analysis, the Government is correct that "[t]he key inquiry is whether Blondet believed, *at the time* [*of the murder*], that his conduct would maintain or increase his position." Gov't Mem. 23 (emphasis added).  The problem for the Government is that, on the trial record, inferring such a belief depends on "pure speculation.  While a defendant's § 1959 conviction is to be affirmed if a motivation to maintain or increase his position may be reasonably inferred from the evidence, such a conviction may not be affirmed where, as here, that inference is based on no more than guesswork." *Thai*, 29 F.3d at 818-19.  As discussed, this case lacks all of the hallmarks of other cases in which the Government's "respect" theory has prevailed.  What is left is that Blondet was a member of a RICO enterprise and killed someone because he felt disrespected.  To affirm his conviction for murder in aid of racketeering on these bases alone, however, would invite the danger of which the *Jones* court warned: It would "blur[] . . . [the] distinction between violent crimes that are committed in connection with a criminal enterprise's affairs and those that arise from purely non-enterprise-related matters." *Jones*, 291 F. Supp. 2d at 89.  "Indeed, taking the government's theory to its logical conclusion, *any* act of violence committed by a member of a drug-trafficking group, whether related to its drug-trafficking objectives or not, would be a [Section 1959(a)]

offense." *Id.* at 89 (emphasis added); *see also Banks*, 514 F.3d at 968-70.  Such reasoning would violate the plain language of Section 1959(a) and decades of Second Circuit precedent.

## CONCLUSION

For the reasons stated above, the Court concludes that the jury's verdict on Counts Two and Three cannot stand and, thus, GRANTS Blondet's Rule 29 motion for a judgment of acquittal on those counts.  As noted, even without those counts, Blondet faces a maximum sentence of life imprisonment.  Moreover, there is little question that, even after this ruling, the Court may consider Blondet's killing of Martinez-Ramirez in determining the appropriate sentence.  *See* 28 U.S.C. § 3553(a) (providing that, in determining the sentence to be imposed, a court "shall consider," among other things, "the history and characteristics of the defendant"; "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant"; and "the need to avoid unwarranted sentence disparities among defendants with similar records"); *cf. United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct.").  To affirm his murder convictions on the record developed at trial, however, would be to disregard the limits that Congress set forth in Section 1959(a) and would be unfaithful to the bedrock "constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt." *Valle*, 807 F.3d at 515 (internal quotation marks omitted).  This the Court cannot do.

The Clerk of Court is directed to terminate ECF No. 693 and to enter a judgment of acquittal as to Blondet on Counts Two and Three of the S13 Indictment.

SO ORDERED.

Dated: December 2, 2022
     New York, New York

_____
JESSE M. FURMAN
United States District Judge